BEVERLY M. CURRY, plaintiff in error, *vs.* WILLIAM A. HIN-MAN, defendant in error.

*Error to Schuyler.*

The copy of the judgment certified to a collector, on which lands are authorized to be sold for taxes, is not process, within the meaning of the seventh section of the fourth article of the constitution, and need not run in the name of "The People."

Where the Legislature has invested the Courts with a novel jurisdiction, and prescribed an original mode of proceeding, unknown to the common law, or not analagous thereto, such proceeding need not, unless the Legislature so directs, run in the name of "The People."

A person claiming title adverse to a sheriff's deed upon a sale for taxes, under the seventy-third section of the revenue law, may avail himself of his rights, if the taxes due the state have been paid the state, no matter by whom they were paid. And a party in possession, having a claim of title, is sufficient evidence that such party "had title to the land," to enable him to maintain ejectment or to defend his title, under the provisions of the same section.

This was an ejectment, brought by Hinman against Curry, in the Schuyler Circuit Court, for the recovery of the south-west quarter section twenty-seven, town. two north, range one, west of the fourth principal meridian, and tried before Mr. Justice Purple, and a jury, at the August term, A. D. 1847, when a verdict was found in favor of the defendant in error, and a judgment rendered thereon.

From the bill of exceptions, it appears that the plaintiff, in order to maintain the issue on his part, read in evidence, without objection, a judgment for taxes against the land in controversy, rendered at the March term, 1840, of the Schuyler Circuit Court; also a precept, issued to the sheriff of Schuyler, upon said judgment, in the usual form; which was objected to, upon the ground that it did not run in the name of the people of the state of Illinois; which objection was overruled by the Court, and an exception taken to the ruling of the Court. Also, a deed executed by the sheriff of Schuyler to George Little, the purchaser at the sale of said land for taxes, under the judgment and precept aforesaid, which conveyed the premises in controversy to the said George Little; to the reading of which defendant objected, but his objection was overruled, and the deed read in evidence to the jury; to which ruling of the Court defendant excepted. Plaintiff then connected himself with said tax title by mesne conveyances. It was then admitted that the defendant was in possession of the premises in controversy, on the day of the commencement of this suit, and the plaintiff rested. The defendant then read, without objection, a patent for the land described in the declaration, from the United States to Daniel Huff, and then offered to read a deed from Huff to James Mackey, and a deed from Mackey and wife to Zadock McNew; which two last mentioned deeds were excluded from the jury by the Court, on the ground that they were defectively acknowledged. Defendant then proved the death of the said Zadock McNew, and that Elizabeth McNew, Zadock McNew, jr., and Polly, his wife, Eli McNew, and Mary Jane, his wife, and Betsy McNew, since intermarried with John McNeely, were his sole and only heirs at law, and thereupon read in evidence a deed from the said heirs to the defendant, dated November 9, 1838, conveying the premises in controversy, in fee simple, to the said defendant; which deed was properly acknowledged and recorded. To the reading of this deed plaintiff objected, but his objection was overruled. The defendant then proved that he entered into the possession of the said land under the said last mentioned deed, and had continued in possession of the same up to the time of the commencement of this suit, claiming title to said land in fee simple. The defendant then read in evidence, without objection, a receipt from the sheriff of Schuyler, for

the taxes due upon the land in controversy for the year 1839, the year for the taxes of which said land was sold; also receipts for the taxes upon said land for the years 1843 and 1844, and closed the evidence on his part. This was all the evidence offered on the part of the said plaintiff or defendant. The following instruction was thereupon given to the jury, on the part of the said plaintiff: "The plaintiff in this case has shown *prima facie* a perfect legal title to the land in controversy. This cannot be defeated by the defendant, unless the jury believe, from the evidence, that the defendant had title to the said land at the time of the sale, and that all taxes due upon said land have been paid by the defendant, or his agent, or the person under whom he claims title. If, however, the defendant entered upon the land under the deed dated November 9, 1838, claiming title, and has continued in possession ever since, claiming title, this will constitute a title within the meaning of this instruction."

There were other instructions given by the Court in favor of the said plaintiff, but they are substantially the same as the one above set forth. To these instructions defendant objected and excepted. The jury found a verdict for the plaintiff, and defendant moved for a new trial; which was overruled, and exception taken. The errors assigned are: first, admitting the precept in evidence; second, giving the plaintiff's instructions; third, in overruling defendant's motion for a new trial.

A. WILLIAMS and R. S. BLACKWELL, for plaintiff in error.

BROWNING & BUSHNELL, for defendant in error.

Opinion by Mr. Justice CATON:

It has been earnestly insisted that the copy of the judgment which was certified to the collector, and on which the lands in question were sold for taxes, was process, within the meaning of the seventh section of the fourth article of the constitution, and should have run in the name of "The People." That section provides, that "all process, writs and other proceedings, shall run in the name of *The People of the state of Illinois.*" It is manifest that these words cannot be taken in their broadest sense, if it is understood that they are to appear upon the face

Curry vs. Hinman.

of every act and proceeding to which they are applicable, as proclaiming the authority by which the act is done, or else every order that is made, or judgment rendered by a Court, would have to show upon its face these words, for "other proceeding" would embrace every act which is done in the administration of the government and the laws, depending for its validity upon power delegated by the people. No one will contend that such is the meaning of the constitution. These words, then, must be construed so as to limit their application, and in order to determine what that limitation shall be, we must seek for the object designed to be accomplished by the insertion of the clause quoted. This object is manifest. It was to provide a name or title by which the sovereign power of the state should be designated. In England, the King is supposed to be the fountain of justice and the source of power, and that sovereign power is there designated by his name and title. In Kentucky, and some of the other states, it is "The Commonwealth;" in Missouri, and some others, it is "The State." Here it is "The People," &c. Where, by the law of England, whence we have mainly borrowed our system of jurisprudence, writs or process are issued, or other proceedings are had expressly in the name of the King, here they should run in the name of "The People." The latter is to be used instead of the former. The meaning is not that every thing shall be done expressly in the name of "The People," but that nothing shall be done in any other name. Whenever the name of the sovereign power is invoked or expressed, that shall be its designation.

An examination of the English practice will show that, generally, where a separate mandate goes forth, under the sanction of the sovereign power, commanding in express terms an officer or subject to do or not to do a particular thing *in pais* which has been ordered or restrained in Court, as auxiliary to, and for the purpose of executing such order, or commanding something to be done preparatory to some other action, as the arrest of a party, there such command usually runs in the name of the sovereign power; but where an order is made directing a thing or act to be done or forborne, either in general terms or by a particular officer or person, but for the doing or forbearing of which no separate and further command is required to be issued, but which order of itself directs its own execution, that order need

not run in the name of the sovereign power, nor need the certified copy which informs the officer or person who is to see it executed, of what has been ordered. There the command is the original order, of which the copy is the evidence and not the auxiliary, although without such evidence of the original the officer might not be authorized to execute it. Analogies are to be looked to and considered. When our Legislature directs process to be issued, which was known to the English law, and was there required to run in the name of the King, or where they have provided equivalents for such process, as our summons, in place of the original process in the English Courts, and our execution, or the fee bill, which the statute directs shall have the same force and effect of an execution, in place of the final process there, then such process here must run in the name of "The People." Where, however, the Legislature has invested the Courts with a novel jurisdiction, and prescribed an original mode of proceeding, unknown to the laws of England, and with which no analogy can there be found, such proceedings need not run in the name of "The People," unless the Legislature specially so directs. Of this character is the proceeding by an administrator to subject the real estate of his intestate to sale, for the payment of debts. There neither original or final process is used. An order is made directing the specific land to be sold, like the order of the Court of Chancery, upon the foreclosure of a mortgage, or the judgment of the Court directing specified land to be sold for taxes. In all these cases a certified copy of the order, decree or judgment, or by whatever name the adjudication may, for convenience, be called, is all the process or authority which the officer, or person who is to carry them into effect, is required to have, and till now it has never been supposed that either was of that character of proceeding which by the constitution is required to run in the name of "The People." Of the two first of these proceedings, probably no one will now contend that any mandatory authority, running in the name of "The People," must be issued to authorize the sale, or that any thing more than simply a certified copy of the order is necessary. It may be said that even this is not required by the law. That may be true, but still the Court may make such a copy indispensable to a valid sale, and it would probably always be better that such copy should issue;

and if required by the order of the Court, surely such copy need not run in the name of "The People," although the Court, in the language of this statute, should, in its order, declare that such copy should "constitute the process on which" the sale should be made. Whether the Court or the Legislature, either of which may make a copy of the order indispensable to a valid sale, chooses to designate it by the name of process, it is not thereby made process, within the meaning of the constitution. Either might, with the same propriety, have called them by any other name, but still they would be but copies of the order, decree or judgment. The meaning of this constitution does not change with a name, else, instead of being a law to the Legislature, it is a flexible instrument in their hands, imposing no restraint, and defining no rule of action. They can no more say that *process* means now what it did not when it was inserted in the constitution, than they can say that it does not mean now what it did then, and if they can do the latter they can abrogate that paramount law. If by calling this process, they cannot change the meaning of the word and make it so, then it is no more process than if they had not given it that name.

Having shown what, as we believe, is the true and unalterable meaning of the constitution, we have a basis upon which we can proceed to a more critical examination of this proceeding.

The revenue law imposes a tax upon the taxable property, of which the assessor in each county is to make a list, and prescribes the mode of assessment; which list and assessment has to be returned to the county clerk. A copy of this list, with the assessment, is furnished to the collector, who is required to collect the same, if necessary, by levying upon the property of the persons against whom the taxes are assessed. In case he is unable to collect the taxes due upon real estate, he is directed to apply to the Circuit Court for judgment against the lands assessed, after having given the requisite notice. The Court is required to hear any defence to the application of the collector for judgment, in a summary way, and without pleadings in writing; and if no defence is made, the Court is required to render judgment against the lands, the form of which is given in the statute, with the following conclusion, which contains the only command to be met with in the whole proceeding: "And it is ordered by the Court that the said several tracts of land,

54

or so much thereof as shall be sufficient of each of them, to satisfy the amount of taxes, interest and costs annexed to them severally, to be sold as the law directs." The entry of this order is the only judgment which is rendered by the Court. The sixtieth section directs the clerk "to make out, under the seal of the Court, a copy of the collector's report, together with the order of the Court thereon, which shall hereafter constitute the process on which all lands shall be sold for taxes, and deliver the same to the collector." It would be difficult for any person to show how this order is, in legal contemplation, any more like a common law judgment than the order directing the lands of an intestate to be sold, or the decree ordering mortgaged premises to be sold; or how the copy of this order delivered to the collector has any more the character or attributes of a common law writ of execution, than a copy of either of the former orders, delivered to the administrator or master in chancery. The truth is, that it has not one single attribute of an execution at law, or of any other proceeding or process which used to run in the name of the King, and it would never have occurred to any lawyer that it could be process, if the Legislature had not so called it. But for this legislative christening he would almost as soon have thought of calling it an indictment. We have already attempted to show that the Legislature could not, by calling names, change the meaning of the constitution. Let us omit this name, and look at the substance of the thing. Had the Legislature called this an order for the sale of land, of which the clerk should furnish the collector with a certified copy, who should thereupon sell the land as directed in the original order, the substance of the law would have been the same, and if such copy would not have been process then, it is not now. If the nature and substance of the proceeding is to govern, and we hold this to be process, then we must overturn all sales which have been made where the name of "The People" does not expressly appear upon the face of the authority by which they were conducted; and where shall we end, in our terrible reform? With equal if not more propriety might it be contended, that the assessment list with which the collector is furnished under the thirty-first section, is process, and should have this constitutional head to make it valid, for under it he is not only required to sell property but he must also levy upon

and seize it. It may be answered, that in that case there is as yet no judgment on which an execution could issue; but, as specious arguments may be found to prove that the assessor—an officer appointed by law for that purpose—had adjudged that the persons named should pay the taxes assessed against them, and thus make out a judgment, and then when we had finally admitted that there was a judgment, the constitution would again be appealed to, for the purpose of proving that the citizen is protected from such *ex parte* judgments, and we should end in overturning every thing, and the Legislature might well despair of ever being able to collect a revenue in a constitutional way. We are not permitted, even if we were disposed, thus to pervert that instrument, and make it an oppressive yoke to the Legislature, rather than a protection to the citizen against injustice. The Legislature never designed, by the force of the statute itself, to provide that this copy of the order should run in the name of "The People," and we think they have not unintentionally made it necessary by the name which they have given it. We are well satisfied that the Circuit Court decided correctly in admitting this evidence.

Two questions arise in this case, under the seventy-third section of the same law. The first is, what taxes must have been paid by the party adverse to the tax title; and secondly, what title to the premises must he show in himself, before he shall be permitted to contest the validity of the tax deed. That section provides, that the tax deed shall be *prima facie* evidence of seven specified facts, the second of which is, "that the taxes were not paid at any time before the sale." It also provides, that, in order to defeat a tax deed, it must be proved "either that the said land was not subject to taxation at the date of the sale; that the taxes had been paid; that the land had never been listed and assessed for taxation, or that the same had been redeemed." And again, by the same section, that no person shall be permitted to question the tax title, without first showing that he or his grantor "had title to the land at the time of the sale, or that the title was obtained from the United States or this state, after the sale, and that all taxes due upon the land have been paid by such person, or their agent, or the person under whom he claims title as aforesaid." What taxes are referred to in the last clause? This is capable of four different con-

structions, neither of which is entirely free from objection. The first is, that all taxes which have accrued upon the land since the tax sale, arc meant; second, that the party must show that he has paid all taxes that have ever been due upon the land; third, that he had paid the tax for which the land was sold; and, fourth, that he had paid all taxes due upon the land, or which remained unpaid upon the land.

The Circuit Court adopted the first of these constructions. To this the objections are so serious that we are not willing to adopt it. The language does not require it. The expression " all taxes due " is perhaps as ambiguous as any that could have been selected, if it is understood as referring to taxes which had previously accrued, and might have been paid by some one. There is no express warrant for saying that it means those taxes, and those only, which have accrued since the sale, and we cannot believe that the Legislature intended to bar all objections, and forever, to an illegal and void sale, and thus throw an impenetrable shield over a void title, not because the real owner had not paid the taxes when he should have done, but because he did not pay them at the earliest possible moment, when they could have been paid; or rather, because he was outstripped in a race to the collector's office, by one who was in effect attempting to defraud him of his land, by forestalling him in the payment of his taxes; for it would be nothing less, at least, than a moral fraud to close the door against all defence to a void title, without any fault or negligence on the part of the real owner. If he pays his taxes within the time prescribed by law, he is as blameless as if he had paid them the first instant that they became due. To say nothing of the power of the Legislature thus, in effect, to divest an innocent man of his property, and give it to another, the monstrous injustice of such a law is too glaring to admit of that construction, if one more just and reasonable can be given to it. With such a construction, the collector would have the sole power of determining who should have the land, by receiving the taxes from one or the other, when both stood by insisting upon the right of paying them. Such cannot be the meaning of this law.

The same objections apply with even greater force to the second construction suggested.

The third, which was contended for by the counsel for the appellant, is that the real owner must show that he had paid the taxes for which the land was sold, before he shall be permitted to defend against the tax deed. This construction, although much more consonant to the principles of justice than the two former, and at least as much within the letter of the law, still we think is not the true one. By this construction, the party must first prove, in order to be permitted to defend against the deed, the same thing, and even more than he is required to establish, in order to defeat the deed itself, for in addition to the proof that he had paid the taxes for which the land was sold, which of itself would show that the sale was illegal, he would have to establish that he "had title to the land." Now, this can hardly be supposed to have been the intention of the Legislature. Ordinarily, the party ought only to be required once to prove the same fact on the same trial. We are disposed to adopt a construction at once more literal and at the same time more liberal, and more consonant to the principles of justice and the object which we think the Legislature had in view in the enactment of the clause under consideration. That object was, not to allow the party to appear in Court and urge a defence, while he was still indebted to the state for taxes on the land in controversy, but to compel him to come into Court with clean hands—to make a continued indebtedness for those taxes a disability in the delinquent party, which he must remove by satisfying the claims of the state before he should be allowed to avail himself of the legal tribunals of the state, to enforce even a legal defence. The words of the statute are, "and that all taxes due upon the land have been paid by such person." If no taxes remain due, then, of course, he is required to pay none to remove the disability contemplated by the statute. If any are due, then he must pay them before he shall be heard in Court. We should be very loth to say that the Legislature intended to create a permanent disability which the party by no possibility could remove. That would be doing indirectly what they could not do directly. To debar an innocent party altogether of the privilege to prosecute or defend a right in the Courts of justice, is equivalent to taking the right from him altogether. The latter they cannot constitutionally do. The former we will not presume they intended to do. It is of no mo-

ment to the state who pays the taxes, if she but gets them. Even though they were collected by a sale of the land, her demand is satisfied, and she has no further cause of complaint. If the lands have been offered for sale for the taxes, and for the want of bidders have been forfeited to the state, then the tax for which they were forfeited remains due to the state, and under the seventy-seventh section, in order to remove the disability created, the party must redeem the premises by paying " all taxes due upon the land." This we think is the most liberal, just and reasonable construction of the statute, and the one which ought to be adopted.

The only remaining question may be disposed of in few words. That arises under the portion of the seventy-third section already quoted. What title to the land must the party show in himself, before he shall be permitted to attack the tax deed? The object of the act was to prevent a mere stranger and wrongdoer, who could lose nothing by the tax sale, from interfering with it, or defending against it. The Circuit Court decided that possession, with a claim of title, was sufficient evidence that the party " had title to the land." In this we have no doubt that Court was correct. That would be sufficient evidence of title as against an intruder or trespasser, even to maintain ejectment; and surely no higher evidence of title should be required to allow the party to defend his possession and claim of title, by showing that the claim set up against him was groundless. If he shows that he had any title which is known to and recognized by the law, that is sufficient to entitle him to defend that title. This is conformable to the opinion already expressed by this Court, upon the same statute, in the case of Lusk *vs.* Harper, 3 Gilman, 158. Whether it was a question for the Court, or the jury, we think the view of the law taken by the Circuit Court was correct. Upon the second question examined, however, we think the Court erred, and for that reason alone the judgment must be reversed, with costs, and the cause remanded.

<em>Judgment reversed.</em>