[Filed March 15, 1886.]

## FANNY M. DOWELL *v.* THE CITY OF PORTLAND.

MUNICIPAL CORPORATION—TAXATION—SALE OF LAND FOR TAXES—STATUTORY POWER.—A municipal corporation in subjecting real property to sale for delinquent taxes exercises a naked statutory power, and to render such a sale valid the statute must be strictly pursued.

SAME—JURISDICTION.—The exercise of such a power is not an "adjudication," nor is it the exercise of jurisdiction in any juridical sense.

SAME—ASSESSMENT TO STRANGER.—Where a city charter provides that the assessment roll of taxes for a street improvement, called the "Docket of City Liens," shall contain the name of the owner of the property assessed, or state that the owner is unknown, an assessment to a stranger to the title is void.

SAME—REASSESSMENT VOID—INJUNCTION.—Where there has been a sale upon such an assessment and payment to the city of the amount thereof, such proceedings exhaust the power of sale in the city, and a subsequent reassessment to the true owner and sale thereunder, after refunding the money obtained on the first sale, is void. An injunction will be granted to restrain such subsequent sale.

PURCHASER AT VOID TAX SALE—VOLUNTEER—CAVEAT EMPTOR.—A purchaser at a void tax sale of such a character is a mere volunteer, and cannot recover back what he voluntarily paid out. To him the doctrine of *caveat emptor* applies. *Per* LORD, J., concurring.

SAME.—It is a rule of universal application in this class of cases that a municipal corporation can make a valid reassessment of property for local improvement in view of an assessment which is insufficient, irregular, or defective, only in those cases where there is a proper legislative authority. THAYER, J., dissenting.

MULTNOMAH COUNTY. Plaintiff appeals. Reversed, and injunction made perpetual.

*George W. Yocum* and *B. F. Dowell*, for Appellant.

This suit can be maintained under the Code, p. 212, sec. 500, or under the general equity doctrines. (*Stark v. Starr*, 6 Wall. 402; *Murphy v. Sears*, 11 Or. 127; *Coolidge v. Forward*, Id. 119; *Teal v. Collins*, 9 Id. 89; *Mason v. Ayers*, 28 Wis. 612; 1 High on Injunction, sec. 372; 1 Story's Eq. Jur., sec. 700, and notes.) A tax purchaser cannot be in any strict technical sense a *bona fide* purchaser, because he has full notice of the proceedings. Such a purchaser comes strictly within the rule *caveat emptor*. (*Hoxter v. Poppleton*, 9 Or. 481; *Lynde v. Inhabitants of Melrose*, 10 Allen, 49; *People v. Auditor-General*, 30 Mich. 12; Cooley on Taxation, 328, 329, note 1, and 375; *Hart v. Henderson*, 17 Mich. 218.) It makes no difference whether the purchaser gets any title or not by his purchase. He trusted to luck, and got it. (*The Key West Gas Light Co. v. Mansell et al.*, 19 Iowa, 305.) The city cannot reassess property, as there is no provision in the charter that authorizes such a proceeding on the part of the council. The legislature must grant such power to the city before it can reassess. (2 Dillon on Mun. Corp., sec. 751; *St. Louis v. Clemens*, 52 Mo. 133.) In *Himmelmann v. Cofran*, 36 Cal. 411, cited on the other side, no sale ever took place under the assessment, and no money was paid, and no lien was ever created or satisfied. No one could invoke the doctrine of *caveat emptor*. And no time was fixed when the assessment

should be made—in our charter the time is fixed. But that opinion states the true doctrine of this case thus: "When a power is conferred which, in the nature of things, cannot be but once exercised, a defective execution exhausts the power." In the other case cited (*Mayor and Aldermen of N. Y.* v. *Colgate,* 12 N. Y. 149), the legislature expressly authorized the proceedings taken.

*R. Williams,* for Respondents.

The entry on the lien docket was made by the auditor in the name of B. F. Dowell who had no interest in the lots, instead of Fannie Dowell, the owner. The omission of the auditor to perform his duty did not deprive the council of the power to sell. (*Himmelmann* v. *Cofran,* 36 Cal. 411; *Breevort* v. *Detroit,* 24 Mich. 322.) The purchase by Monastes and payment of the purchase price did not discharge a lien against these lots that had never been created, nor did it discharge the liability of the owner after the lien was created. (*Libby* v. *Burnham,* 15 Mass. 144; *The Mayor of N. Y.* v. *Colgate,* 12 N. Y. 149.) When the sale is void, the amount received by the city therefrom must be refunded. (*Mayor of N. Y.* v. *Colgate, supra; Corbin* v. *Davenport,* 9 Iowa, 239.) A collector has no power to receive payment of a tax and execute a receipt therefor before it is assessed. (*Cossart* v. *Spence,* 23 Ark. 374; Blackwell on Tax Titles, *414 and 415.) If the plaintiff claims the benefit of the money paid in by Monastes on a void sale of the lots, she cannot, without refunding the purchase-money, have his deed canceled in equity. (*Hunt* v. *Rowland,* 28 Iowa, 349; *Light* v. *West,* 42 Id. 138; *Mayer* v. *The Mayor etc.,* 63 N. Y. 455.) When the tax is valid but the sale is irregular, equity will not cancel the tax deed to the land without a tender of the purchase-money. (*H. L. Society* v. *Ordway,* 38 Cal. 679; Blackwell on Tax Titles,

491, 492; Pomeroy's Eq. Jur., sec. 393; *Morrison* v. *Hershire*, 32 Iowa, 271; *Harrison* v. *Haas*, 25 Ind. 281.)

WALDO, C. J.   The charter of the city of Portland provides that the assessment roll of taxes for a street improvement, called in the charter the "Docket of City Liens," shall contain the name of the owner of the property assessed, or shall state that the owner is unknown. The lots were assessed to a stranger to the title. This case arises on an attempt to reassess to the true owner after a sale on the first assessment and payment of the purchase price.

"Tax titles were unknown to the common laws of England.   The only way in which an Englishman's lands could be involuntarily aliened, except in case of forfeiture for treason, was by judgment of law; or as it is expressed in the great charter, 'law of the land.'" (9 Amer. Law Rev. 566.)   An American may be deprived of his lands without the judgment of his peers, and even without notice; but it is to the credit of the common law that no sanction for such proceedings is found in its bosom, and that its wise rule of statutory construction, that statutes in derogation of its principles are to be strictly construed, has not tended to facilitate the divestiture of property by such proceedings—proceedings which are not only alien in principle, but even in the language in which they are expressed.   When counsel say, "This is a proceeding *in rem*," we expect some argument better suited, as the author of the Commentaries in another connection has said, for a despotic monarchy than the free constitutions of an English people.

In this case, the name of a stranger having been entered on the docket, the sale was void as to the plaintiff. (*Smith* v. *Cofran*, 34 Cal. 316; *Hubbell* v. *Weldon*, Hill &

D. Sup. 142; *Bush* v. *Williams,* Cooke, 274; *Abbott* v. *Lindenbower,* 42 Mo. 162; *Dunn* v. *Winston,* 31 Miss. 137; *Clarke* v. *Strickland,* 2 Curt. 444; *Corporation of Washington* v. *Pratt,* 8 Wheat. 681.)

A power has been stated to be the dominion which one person exercises over the property of another. (*Maundrell.* v. *Maundrell,* 10 Ves. jun. 265.) The city exercised a naked statutory power. It was not adjudicating anything, and therefore not exercising jurisdiction over anything, in any juridical sense; or, if so, then every grantee of a power is exercising jurisdiction when he executes the power. When the reassessment was ordered, the property had been sold and the assessment paid into the city treasury. The power to sell had been executed and exhausted. There was no authority to refund and reassess. This suit, therefore, cannot be maintained. (*Hamilton* v. *Valiant,* 30 Md. 139; *Lyon Co.* v. *Goddard,* 22 Kan. 398; *Harper* v. *Rowe,* 53 Cal. 234; *Curry* v. *Hinman,* 11 Ill. 420; *Homestead Co.* v. *Valley R. Co.,* 17 Wall. 153; *Peebles* v. *Pittsburgh,* 101 Pa. St. 304; *St. Paul* v. *Mullen,* 27 Minn. 78; *Allen* v. *Smith,* 1 Leigh, 231–250; *Irvine* v. *Elnon,* 8 East, 54; *Smith* v. *Bowes,* 38 Md. 466; Blackwell on Tax Titles, 356.)

The decree below must be reversed, and the court below directed to make the injunction perpetual.

LORD, J. (concurring). The regularity of the proceedings prior to the entry upon the lien docket of the assessment is not questioned. The defect was in recording the assessment in the name of B. F. Dowell instead of Fannie Dowell, who is the owner. Under the charter, when the assessment is recorded as required, it becomes, from that time a lien upon the property. It is admitted that all the subsequent proceedings for the sale of the lots, were vitiated by this defect, and of no legal force or effect.

But it is contended that the city has the power, after the sale and the payment of the purchase-money to it, to refund the money to the purchaser, and to reassess the property by making a correct entry thereof, conformable to the facts, by which the lien shall be created and a valid assessment made. It is conceded that there is no legislative sanction or authority in the charter to do this; but it is claimed that the right results from the fact that the power to create the lien by making a correct entry has never been exercised, and therefore the city may disregard the previous void proceedings for the sale of the lots, return the money to the purchaser, and cause the original assessment to be properly recorded, and the lots again sold. If this can be done at this stage of the proceedings, in the absence of any legislative direction or authority, it must be because the making of such erroneous entry was simply a formal defect, or to say the least, a mere irregularity which may be waived or corrected. It certainly cannot be done if the making of a correct entry is essential to create the lien, or the making of a defective one is fatal to it, and vitiates all subsequent proceedings, which the argument admits; for it is an elementary principle in proceedings of this character, the power conferred being purely statutory, that every essential requirement leading to the ultimate act must be in strict conformity with the statute. A step or matter so indispensable that without its proper performance no valid assessment can be made, or lien created, cannot be regarded as a mere directory requirement, or irregularity, which may be dispensed with or corrected without some positive legislative authority. But to avoid this embarrassment, it is said that the power of the city or its auditor to create the lien has never been exercised, and that, therefore, the city is not deprived of its power in the premises. Even if this argument was available (which is not admitted or de-

cided), it cannot be applied to the facts here. It overlooks the distinction between the failure to exercise a power and the defective exercise of the power. The case here is not the failure of the auditor to exercise his power, and make an entry in the lien docket, but in the exercise of the power he has made an incorrect and defective entry, which has failed to create the lien, and vitiated all the subsequent proceedings. It was rather a defective execution of the power than a failure to exercise the power. If the sale had been made without the semblance of an entry upon the lien docket whatever, it might then be said the power conferred was never exercised for the creation of a lien.

The true inquiry, then, is whether the auditor had the power to make a second entry for the purpose of correcting the error of the first, upon which the void sale was made; or having once made his entry, was his power in this respect entirely exhausted, or at an end? and did the one now made, or could it, create a lien? By the charter, after the doing of certain things therein prescribed, and the amount of the liability to be charged against the property benefited is ascertained, the charter requires the auditor to make an entry of the same in the lien docket, in the manner therein prescribed, and thereafter such liability or amount becomes a lien against the property. It thus appears that the power of the auditor to make the entry by which the lien is created is derived solely from the statute or charter, and not otherwise. Without such power conferred, his entry would create no lien or charge against the property. There is no suggestion, in express words, or by implication, in the charter, that he can make any other or more entries than the one prescribed. But if the auditor, upon his own motion, or under direction of the council, may ignore the first entry, and make a second, then

what is the limit, and how often may he make such entries or exercise such power to make good his mistakes or errors? The fact that the statute gives him no such power, and the rule of strict construction universally recognized and applied by the courts in this class of proceedings, ought to be sufficient to settle this question without recourse to judicial precedent. The fact, too, that his authority is delegated by law, and his duties in the premises are purely ministerial, and involve the exercise of no judicial function, would exclude his power of amendment, upon common-law principles, without the aid of some statute. In stating the general principle applicable to such officers, Mr. Blackwell says:

" The acts of ministerial officers are to be tested by the law which authorized them. When the act is completed, their power is *functus officio;* and if in the record, return, or other evidence of their acts they have failed to conform to the requisitions of the law of the land, or to state the facts as they actually transpired, the error cannot be obviated by amendment, because their power over the subject is exhausted. By the record, as originally made, their acts must stand or fall." (Blackwell on Tax Titles, 357.)

Nor must it be overlooked that the matter here is not *in fieri.* The auditor had exercised his power—had made his entry—and under color of that act as thus performed and done the subsequent proceedings were had, the property sold, the deed executed to the purchaser, and the money in payment thereof passed into the treasury of the city. It is true, the purchaser got no title because of the defect, but the city, nevertheless, got its tax, although upon a void assessment. Can the city now, upon this state of facts, refund the money to the purchaser, in order to enable it to reassess the property in the name of the appellant, and thus create a lien

against it for the purpose of again subjecting it to sale in case of delinquency? This question has already been answered, but let us examine the matter in another light. How do the parties stand? The city has got the amount of the assessment in its treasury as the purchase price of the land sold under the void assessment. The purchaser, it is admitted, got nothing; but that is his fault or neglect, and not the appellant's, for to him the doctrine of *caveat emptor* applies. He had full notice of the defect in the assessment or proceedings, or could have obtained it. He is a mere volunteer, and cannot recover back what he voluntarily paid out. " The general rule is beyond dispute that the purchaser at a tax sale assumes all risk, and except as he may be vested by force of statutory provisions with the lien which the state or municipality held against the property of the delinquent tax debtor, he is without remedy if he fails to obtain a good title under his purchase. The doctrine of *caveat emptor* applies to such sales in its fullest force." (Wood, C. J., in *City of Logansport* v. *Humphrey*, 84 Ind. 469; *Lynde* v. *Inhabitants of Melrose*, 10 Allen, 49; *Packard* v. *New Limerick*, 34 Me. 266; *Hamilton* v. *Valiant*, 30 Md. 139.) The city does not warrant such titles, nor can it bind itself by an agreement to warrant the title of a purchaser at such sale, unless such power is conferred by the charter or statute. (*City of Logansport* v. *Humphrey, supra.*) If a municipality cannot warrant tax titles to purchasers without legislative authority, how can it return the money to such purchasers without like authority, when his payment has been voluntary? The money is now in the treasury, and is the property of the city. Unless there is statutory power to return it, the money must remain in the treasury, and what liability exists out of which, by a corrected entry on the lien docket, a lien can be created against the property

of the appellant? To do either there is a want of stat-
ute authority, and without this the authorities cited by
the chief justice abundantly show it cannot be done.
Indeed, it may be laid down as a general principle of
universal application to this class of cases that it is only
where there is proper legislative authority, a municipal-
ity may make a valid reassessment of property for local
improvements, in view of an assessment which is insuf-
ficient, irregular, or defective. (*Howell* v. *Buffalo*, 37
N. Y. 267; *In re Van Antwerp*, 56 Id. 261; *Brown* v. *Mayor*
*of New York*, 63 Id. 239; *Emporia* v. *Bates*, 16 Kan. 495;
*State* v. *Newark*, 34 N. J. L. 236; *Edwards* v. *Jersey City*,
40 Id. 176; *Whittaker* v. *Janesville*, 33 Wis. 76; *Brevoort*
v. *Detroit*, 24 Mich. 322; *Mills* v. *Charleton*, 29 Wis. 400;
*Hubbard* v. *Garfield*, 102 Mass. 72; *Tweed* v. *Metcalf*, 4
Mich. 590; *Chicago* v. *Ward*, 36 Ill. 9; *Meuser* v. *Risdon*,
36 Cal. 239; *Schenley* v. *Commonwealth*, 36 Pa. St. 29.) I
feel constrained, therefore, upon the state of facts pre-
sented by this record, to concur in the opinion of the
chief justice.

THAYER, J. (dissenting). This appeal is from a decree
rendered by the circuit court for the county of Multno-
mah, in favor of the respondents and against the appel-
lant, in a suit brought by the latter against the former
to enjoin the sale of lots 6 and 7, in block 182, Couch's
addition to the city of Portland, to recover certain sums
of money respectively assessed upon said lots for the im-
provement of North Fifteenth Street in said city, under
its authority to improve streets. The appellant alleged,
in substance, ownership in herself in fee-simple of said
lots by purchase from the heirs of John H. Couch prior
to the year 1879, and that in August, 1880, by order of
of the common council of said city, the improvement of
said North Fifteenth Street was directed to be made in

OREG. XIII.—17

front of and adjoining said lots, and they were assessed on account of the improvement, in the name of B. F. Dowell, $181.16, about $90 each; and that on or about the twenty-fourth day of said month said assessments were, by order and direction of the common council, entered in the docket of city liens by the auditor of said city, and against B. F. Dowell, as the owner thereof; that on the fifth day of January, 1881, a warrant was issued by order of said common council to the then chief of police of said city, J. H. Lappeus, for the enforcement of said tax, who, by virtue thereof, levied upon said lots as the property of said B. F. Dowell, and on the seventh day of February, 1881, sold them at public auction. as the property of B. F. Dowell, to the highest bidder for cash in hand; and that the respondent Monastes was the highest bidder at such sale, and became the purchaser of said lots, and other lots included in said warrant not involved in this case, for the price and sum of $354.76; that said Monastes, on said seventh day of February, 1881, as purchaser at said bid, paid over to the said chief of police said sum of assessments, including costs and expenses, aggregating the sum of $387.40, and that the latter thereupon executed to him a deed of conveyance, in due form of law, for said lots.

The appellant, in her said complaint, further alleged that Monastes, at said sale, purchased all the right of B. F. Dowell to said lots, and paid for it to the chief of police said sum, and received and accepted the deed; and that said money was applied in full satisfaction of said assessment; and that all prior taxes and assessments and liens created, or attempted to be created, upon the lots listed or assessed in the name of B. F. Dowell, or the appellant, were fully satisfied; that B. F. Dowell, in 1872, after the deeds from the Couch heirs were recorded, took actual possession of said lots, cleared off the timber,

fenced them, and built a dwelling-house thereon, and leased the same, and collected and appropriated the rents to his own use, without any authority from the appellant until after said sale to Monastes; thereupon he gave the possession thereof to the appellant, and that she has had the actual possession ever since, collected the rents, and converted them to her own use, and that B. F. Dowell never claimed any title in said land, except the legal title of possession, and he quitclaimed the possession in about five days after said purchase by Monastes; that on or about the sixth day of February, 1884, at the instance of Monastes, the said common council fraudulently pretended, and did formally pass an ordinance (No. 4,142) —as a charge and relief bill for Monastes—declaring in said ordinance, which was approved by the mayor of said city on the seventh day of February, 1884, that the former entries of said assessment made in the docket of city liens against said lots, and B. F. Dowell as the owner thereof, were mistakes and errors; that said ordinance further directs the auditor of said city to enter a statement of the said assessment of said lots, with the costs of enforcing the same in the docket of city liens; and thereafter, on or about the fifteenth day of April, 1884, the auditor of said city, in obedience to said ordinance, proceeded to enter a statement of the assessment of said lots, and the costs of entering the same in the docket of city liens; that the deed from Lappeus to Monastes only conveyed B. F. Dowell's tenancy at will to the latter, and said ordinance is fraudulent and void against the title of appellant; that all prior taxes and assessments on said lots in the name of B. F. Dowell and appellant, or either of them, in favor of the city of Portland, were paid and satisfied prior to the passage of said ordinance No. 4,142, and the city of Portland and Monastes well knew the same prior to the time of the pas-

sage of said ordinance, and that it was made for the use and benefit of said Monastes, without any consideration whatever, and with intent to cheat and defraud the appellant out of said sum assessed upon said lots; that the city of Portland and Monastes had constructive notice prior to and at the time said lots were assessed to B. F. Dowell, and at the time of the assessment and sale, and the making and recording of said deed, that appellant was the owner of said lots in the fee-simple; that prior to the assessment to B. F. Dowell, Monastes had actual notice that appellant was the owner in fee-simple prior to and at the time said deed to him was recorded in said clerk's office, and notice that B. F. Dowell had no title to said lots, except the possession, and that he was not then, nor ever had been, the owner of said lots of land in fee-simple, or any part thereof ; that after Monastes knew the appellant was in actual possession of and owner of said lots in fee, he caused said deed from Lappeus to be recorded, and he claimed said lots, and caused said ordinance 4,142 to be passed, and that said claim and ordinance depreciate the value of the lots, and injure the possession and enjoyment of them; that on or about the fifteenth day of September, 1884, in pursuance of the order and direction of the common council, the auditor issued a warrant to enforce the collection of $181.16, and costs and expenses assessed against said lots, and against the appellant as the owner thereof; that afterwards, on the seventeenth day of September, 1884, said last-mentioned warrant was delivered to the respondent, S. B. Parrish, chief of police of said city; that said warrant commands the said chief of police to proceed forthwith to levy upon said lots, and sell the same in the manner provided by law, to make said assessment, costs, and expenses, and to return the proceeds of such sale to the city treasurer; and that, in obedience thereto, the chief of police, said

Parrish, has pretended to, and has formally, levied said warrant upon said lots for sale, at public auction, to satisfy said assessment; that said Parrish, if not restrained, will sell the same, which will cast a cloud upon the title; that said common council had no power to pass said ordinance No. 4,142, or to order or direct said auditor to enter a statement of said assessments upon the docket of city liens, or to direct said auditor to issue said warrant to enforce the collection of said tax; that said Lappeus had no power or authority to sell or convey said lots to Monastes in fee-simple, or any title but the possessory title of B. F. Dowell; that said assessment, levies made by virtue thereof, and deed of conveyance made to Monastes, are apparently regular on their face, conform to the forms of law, and apparently give Monastes a title to an extent calculated to deceive, mislead, embarrass, and clog appellant's title in fee-simple. The complaint contains a prayer, the substance of which is that the respondents be enjoined from further proceedings to enforce said assessments, and from selling said lots 6 and 7, and to declare the said deed from Chief of Police Lappeus to Monastes only a conveyance to the latter of the possession of B. F. Dowell of said lots between the time of the sale thereof, by said Lappeus to Monastes, and the time he, said B. F. Dowell, gave the possession to the appellant, alleged in the complaint to have continued five days.

The respondents interposed a demurrer to the complaint upon the grounds that the facts alleged did not constitute a cause of suit. The Circuit Court sustained the demurrer, and the appellant having failed to amend, entered a decree dismissing the complaint, which is the decree appealed from.

The appellant's suit proceeded upon the theory that the assessment upon which the lots were sold by the chief of

police, Lappeus, was a personal tax, and that consequently it was only a charge upon the interest which the party named as owner in the docket of city liens had in the property. I have examined that question in another case before this court, and concluded that an assessment for street improvements upon the adjoining property was in the nature of a proceeding *in rem;* that the charter pointed out the various steps to be taken in order to make the assessment, and that it must be strictly complied with, else the assessment, and all proceedings had thereon, will be void. The tax is against the lots charged with the expense of the improvement. The charter requires that a statement be entered in the docket of city liens, containing, among other things, the name of the owner of the lot assessed, or that the owner is unknown; and it provides also that, to ascertain the owner, the city auditor shall take the certificate of the county clerk, stating who the owner is at the date of the ordinance making the assessment. (Secs. 86, 87, c. 8, Charter in force in 1879.) In order, therefore, to make a valid assessment, the name of the real owner must have been entered in said docket, or an entry that the owner was unknown, or the name of a person certified by the county clerk to be the owner. Either would have answered the requirements of the charter in that particular. When the name of a person is inserted in the docket as the owner of the lot who is not such owner, unless it is stated in such certificate that he is the owner, the proceeding will be a nullity, for the reason that the provisions of the charter have not been observed; but where they are fully complied with, all the estate or interest therein of the owner, whether known or unknown, is conveyed, subject to redemption, to the purchaser. (City Charter, sec. 114, c. 10.)

The nature of the proceeding, and the intention of the legislature as expressed in the charter, clearly indicate

that the assessment and sale of the lot, in such a case, are designed to transfer the absolute proprietorship of it, in case no redemption is had. From the date of the entry of the assessment upon a lot, or part thereof, the sum so entered is to be deemed a tax levied and a lien thereon, which lien has priority over all other liens or incumbrances thereon whatever. (City Charter, sec. 103, c. 10.) It becomes, by force of the charter, when its provisions have been strictly observed, a *jus in re*, and the sale of the lot to enforce the payment of the assessment must operate to transfer the ownership, or else be wholly inoperative. The principle decided in *Corporation of City of Washington* v. *Pratt*, 8 Wheat. 682, is decisive of this point. The sale, therefore, by Chief of Police Lappeus to Monastes of the lots in question either conveyed an absolute title, there having been no redemption, to the latter, or it was a nullity. If the auditor had applied to the county clerk of the county of Multnomah for a certificate as to the ownership of the lots, and the latter had furnished it, showing that B. F. Dowell was such owner, the lien would have been perfected, as it is doubtless in the power of the legislature to provide such mode for ascertaining ownership. In the case of *Corporation of City of Washington* v. *Pratt, supra,* the court says, after concluding that the assessment there should have been made to the real owner, that, "had congress intended to lighten the labors of the corporation, or their assessor, in this respect, there was a very simple means of doing it. They might have sanctioned a designation with reference to the first or last vendee of record " (p. 685).

But we cannot presume, as urged by one of the appellant's counsel upon the argument we should, that that was done; though I am convinced that, as the auditor failed to enter in said docket the name of the rightful owner, the assessment was incomplete and ineffectual

for any purpose, and the tax failed to become a lien upon the lots; .and that the attempt of the city officers to sell them under the proceedings specified above was a void act. But I am satisfied that the power of the city was not exhausted in consequence of such failure. In *Himmelmann* v. *Cofran*, 36 Cal. 413, in a similar case, Judge Sawyer uses this language:

" In this case the statute makes it the duty of the superintendent, after the fulfillment of the contract to his satisfaction, to make an assessment to cover the sum due for the work performed in accordance with the provisions of the act, and afterwards to issue a warrant thereon. No time is limited in which the assessment must be made. Time is therefore not of the essence of the power. In this case, under the decision in the case cited (*Dougherty* v. *Hitchcock*, 35 Cal. 512), he has never made an assessment in pursuance of the provisions of the act. His act was utterly void, and of no more legal force than so much blank paper. His act, in legal contemplation, was no act. The warrant issued, based upon his blank and void assessment, and all subsequent proceedings, were void. They created no lien or charge upon the land, in no way affected the rights of the parties. The superintendent has not performed the duty enjoined upon him by the act, and we know of nothing that stands in the way of his performing it now."

The right to exercise the power to assess the property in the above case, under the circumstances surrounding the affair, was much more questionable than that of perfecting the lien in the case under consideration. Here the assessment was complete, so far as it went. Notice had been given of the contemplated improvement of the street. No remonstrance by two thirds of the owners of the property adjacent thereto had been signed or filed. The council had proceeded to ascertain and determine

the probable cost of making the improvement, and had assessed each lot and part thereof liable therefor its proportionate share of such cost, and the same was declared by ordinance. All that remained was for the auditor to enter the statement referred to, and the cost would then become a lien upon the lots. It stood like the recovery of a judgment in a court of justice before docketing it. The lots were a fund out of which to pay the expenses of the improvement, but the auditor, in entering the said statement, inserted the wrong name as owner of the lots in question. The council had directed him to file a statement as required by the charter, and he failed to do it. Now, how can it be claimed, in reason and justice, that the council cannot again direct him to do his duty? He had not carried out the direction of the council, and it was certainly the duty of that body to require him to perform it. Can it be maintained that the council, where it has directed a ministerial officer to perform a ministerial duty, and the officer has not done it, is *functus officio* in regard to the matter? That would certainly be the height of absurdity. If the charter should have required, in order to complete the lien, the recording of a copy of such entry in the county clerk's office, and the council had directed the auditor to have the same so recorded, but in attempting to comply therewith he had taken it to the wrong clerk's office; or, in making a copy, had made a mistake—would any one pretend that it could not be corrected without a proceeding *de novo?* What wrong could accrue to the lot-owner in consequence of such a correction? Must he be permitted to shirk his share of a common burden because of the neglect to observe some nicety that does not affect his rights in the least? Is the law made up of mere refinements and quibbles?

In this case, the city gave notice of a proposal to improve

North Fifteenth Street. The owners of the lots adjacent thereto could have defeated it by a remonstrance. The city had no way of raising a fund to defray the expenses except to charge it upon such lots. The lot-owners, by neglecting to file a remonstrance, tacitly assented to the improvement, knowing that the costs must be charged upon the lots. The costs were so charged, the contract let, and the improvement completed. The burden is apportioned. The lots have received the full benefit. All the lot-owners are supposed to have paid their share except the appellant, who insists that she should not be compelled to pay her proportion because the auditor, in entering the assessment in the city lien docket, after the council had ascertained and determined the proportionate share of the cost to be assessed to the lots and declared the same by ordinance, had inserted her father's name instead of hers in the docket as owner. And when the mistake has subsequently been discovered, and the auditor is directed to do what he at first should have done in order to enforce an obligation that equality and the law demand, she comes into a court of equity to have it exercise its restraining power to shield her from being compelled to do that which natural justice dictates she ought to do. I must confess that I am unable to discover any grounds for equitable interference in such a case, even though the city council had no power to cause the said entry to be properly made. I do not believe that it is within the province of equitable cognizance to shield a party against the enforcement of a just claim in any case, nor that there is any stronger moral obligation than that which requires a party who has been the recipient of a common benefit to contribute to the burden which it imposes.

But it is due the credit of the appellant's counsel that they did not base the appellant's claim for relief upon

the technical irregularity referred to. They placed it upon fair legal grounds; contended that B. F. Dowell had some kind of an estate in the lots, and that the sale under the proceeding to Monastes divested Mr. Dowell's interest, and that Monastes acquired it under the pur-chase. If their position had been correct—if the mere right of the person named in the entry made in the city lien docket as owner was affected—there would have been much force in the position. A part of the relief demanded in the complaint was, that the deed from Lap-peus, chief of police, to Monastes, be declared only a conveyance to the latter of the possession of Mr. Dowell to said lots during the five days before mentioned. Said counsel did not question the regularity of said sale. They claimed that it was regular, and conveyed an actual sub-sisting interest in the property, though a very slight one, to Monastes. If the sale had had such effect, the argument would have been conclusive; but it did not. It did not convey anything—not even Dowell's said five days' possession. Such a proceeding is not against an owner or occupant of the property—it is against the prop-erty itself. The city charter requires that the statement entered in the docket of city liens shall contain the name of the owner, or that the owner is unknown. This pro-vision was not complied with. B. F. Dowell in no wise was the owner of the lots in the sense intended by the charter, and for that reason the sale to Monastes was wholly inoperative, not because the previous proceed-ings were irregular, for they were not—they were regular and valid up to that time—but the issuance of the war-rant for the sale of the lots to satisfy the demand was irregular, in consequence of the entry in the lien docket of a wrong statement as to the ownership.

The matter was not, however, in the condition of the case of *The Fideliter* v. *United States,* 1 Saw. 153, nor of

that of *Pennoyer* v. *Neff*, 95 U. S. 714. In those cases the whole proceedings were void *ab initio*. In the former one, it was held that an actual seizure must be made of a vessel before any judicial proceedings are instituted to condemn it for a violation of the navigation laws of the United States, and in the latter, that a substituted service of process was not sufficient to confer jurisdiction where the property was not brought under control of the court by seizure under an attachment. It was more like a case, as before suggested, of a judgment recovered but not docketed. A sale of the property before the lien of the assessment attached conveyed no interest in it whatever, and the lien did not attach until there was the entry of the statement in the city lien docket containing the name of the true owner of the property affected, or that the owner was unknown. A sale made before the cost of the improvement was apportioned would have been as effectual to pass title as this one. The issuance of the warrant, and all proceedings had thereon, were, as said by Judge Sawyer, " utterly void, and of no more legal force than so much blank paper"— were, " in legal contemplation, no acts."

But the prior proceedings were not affected. The improvement of the street had properly been ordered, the cost legally ascertained and determined, the apportionment duly made upon the lots chargeable therewith, and the work completed. The power, however, to enforce payment had been interrupted by the failure to enter a true statement as to the ownership of the property as mentioned, and the council was compelled to go back to the point in the proceedings where the fault occurred and begin over. Had it occurred in the outset, in some preliminary step authorizing the proceeding to improve the street—such as giving notice of the proposed improvement—the whole affair would have been upset. There

would have been no foundation to support it.    But juris-
diction had attached, the proceedings were regular and
valid up to the time of entering the statement, and a
failure to enter a statement at all, or an improper one,
which would be no statement, could not have invalidated
the previous proceedings.    All the council had to do was
to go back to the point where the break occurred, and
require that done which ought to have been done when
the first attempt was made.    There are cases, as said in
*Himmelmann* v. *Cofran*, 36 Cal. 413, in which a defective
execution of a power exhausts the power, but as there
said, "it is when the nature of things is such that it can-
not be but once exercised;" or, in other words, be but
one attempt to exercise it.    The case of the assessment
of property by a county assessor for the purposes of tax-
ation is an example.    The assessor is required to perform
his duties within a certain period, and turn over the
assessment made to the county court.    After so doing, he
would not, of course, have any right to correct his work;
but there is no such limitation upon the power of the
common council of the city of Portland.    That is a con-
tinuous body, holding by perpetual succession.    Its power
is not limited by any definite period of time, nor exhausted
except by a performance of the thing it is empowered to
do, unless circumstances have intervened to prevent.    If
the appellant had transferred the lots in question to an
innocent purchaser, after the entry of the said statement,
it might have had the effect to defeat the right of the
council to correct the error committed; but that would
have resulted from another principle of law.    As the
matter stood, however, I am convinced that it had full
right to cause a proper statement to be entered in the
city lien docket.    It is true that the city had got Monastes's
money bid for the lots on the bogus sale, but it had no

right in justice to keep it. The sale under the proceedings was an assurance that the requirements of the charter had been complied with; and it has been held that when a sale is void the amount received by the city therefrom must be refunded. (*Mayor of New York* v. *Colgate,* 12 N. Y. 140, 147; *Corbin* v. *Davenport,* 9 Iowa, 239; *Chapman* v. *City of Brooklyn,* 40 N. Y. 372; *Newman* v. *Supervisors of Livingston Co.,* 45 Id. 676.) I can discover no good reason why such should not be the rule within the principle laid down by Judge Field in *Argenti* v. *San Francisco,* 16 Cal. 255–282. He there says:

"The doctrine of implied municipal liability applies to cases where money or other property of a party is received under such circumstances that the general law, independent of express contract, imposes the obligation upon the city to do justice with respect to the same. If the city obtain money of another by mistake, or without authority of law, it is her duty to refund it, not from any contract entered into by her on the subject, but from the general obligation to do justice, which binds all persons, whether natural or artifical."

Judge Dillon has attached sufficient importance to this language to incorporate it as a part of the text in his work on Municipal Corporations. (2d ed., sec. 384.)

If the rule is as suggested, then Monastes can claim from the city the money paid, and the tax assessed against the lots must either be borne by the appellant or the tax-payers of the city generally. That the latter result would be an injustice and wrong could not be truthfully denied. For my own part, I am not willing to adhere to any capricious ruling in order to shield the appellant from the payment of her own debt, and enable her to shift it upon parties who have received no special benefit of the consideration out of which it arose. Nor do I believe

the law, properly understood and administered, would
countenance any such determination.   I do not think
the appellant is entitled to any relief in the case, and
that the decision of the Circuit Court upon the demurrer
should be sustained.

[Filed March 17, 1886.]

